**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JAMAL BROOKS, an individual; AUSTIN
THOMPSON, an individual; WAYNE
SWANSON, an individual; DARRYL
PAYTON, an individual; AUDRA
CUNNINGHAM, an individual; SABRINA
MCKENZIE, an individual;  JAMIDA
ORANGE, an individual, ANDREA SNOW,
an individual; SAMMY ARREY-MBI;
LYNNE ANDERSON, an individual; and
CORETTA JACKON, an individual,

        Plaintiffs,

       v.

BRIAN KEMP, in his official capacity as
Secretary of State of the State of Georgia,

        Defendant.

Civil Action No. _____

**Three-Judge Court Requested**

**COMPLAINT**

1.    Plaintiffs bring this action to challenge the Georgia General Assembly

redistricting plan, Act No. 251 (2015 Ga. Laws 1413) ("H.B. 566"), on the grounds

that it violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and

the Fourteenth and Fifteenth Amendments to the United States Constitution.

Through mid-cycle redistricting, the General Assembly has sought to dilute

growing African-American voting strength, targeting areas where African-

1

American candidates were poised to attain seats in the Georgia House of Representatives. And it has succeeded. The General Assembly not only effectively quashed the growing minority population's voting strength in two specific House districts in the Atlanta exurbs – Districts 105 and 111 (the "Challenged Districts") – it further circumvented the creation of at least one additional majority-minority district that would provide African-American voters the ability to elect their candidates of choice.

2.   This assault on voting rights has had the purpose and effect of artificially suppressing the ability of African Americans to participate equally in the electoral process in Georgia in a stark, measurable way: but for the illegal actions of the General Assembly, there would likely be at least three additional African-American representatives currently serving in the Georgia House of Representatives.

3.   Further, because the means by which the General Assembly reached its impermissible goal was to move substantial numbers of Georgians in and out of the Challenged Districts predominantly based on race without a compelling government interest, its actions amount to an unconstitutional racial gerrymander. The State is almost certain to argue that the goal was political, not race-based. But the evidence tells a different story. Even if the General Assembly's overarching

2

goal was to protect political interests, the State's use of race as a proxy to meet its political ends runs afoul of the Equal Protection Clause.

4.      While Georgia remains a state where the majority of voters tend to vote Republican, it is not so imbalanced as to naturally create the severely lopsided partisan representation currently found in the General Assembly's House of Representatives. Republicans currently hold 118 out of the 180 seats, just shy of a supermajority, which would give Republicans the unfettered freedom to amend the state constitution and pass any legislation they wish without Democratic input, effectively silencing the voices of the State's approximately 3.3 million African-American residents, who vote overwhelmingly Democratic. Indeed, of the 62 members of the House who are Democrats, 47 are African-American, and all of the African-American members are Democrats.

5.      H.B. 566 specifically targets districts where White Republicans have become increasingly vulnerable to challenge by African-American Democratic candidates, moving voters in and out of House districts based on their race so as to shore up the incumbent Republicans' prospects in future elections.

6.      That such blatant action has become necessary is the result of changing demographics in certain parts of the State – particularly in the Atlanta exurbs – which have made districts in those areas significantly more competitive.

3

In response, the Republican-majority in the General Assembly has used reapportionment legislation to put a heavy thumb on the scale. And, as noted, it has done so specifically by targeting Georgia's African-American population, in an attempt to diminish their growing political influence.

7.     H.B. 566 has its genesis in the 2011 redistricting map (Act No. 1EX), which packed Georgia's African-American voters into as few districts as possible; in many cases, the result was a Black Voting Age Population ("BVAP") of nearly 70%.

8.     Despite this, in the years that followed, changing demographics made some of the General Assembly's carefully drawn Republican seats – particularly in the fast growing Atlanta area – increasingly vulnerable. This phenomenon was most obvious with regard to House Districts 105 and 111, where the incumbent White Republicans barely fought off challenges in 2012 and 2014 by African-American Democrats.

9.     According to the Pew Research Center, among the 78 counties in the United States in which, between 2000 and 2013, Whites went from comprising more than half of the population to less than half of the population, four counties in Georgia stand out for having the biggest percentage-point swings in their White population share. As an example, in Henry County, the population's White share

4

fell from 80.1% in 2000 to 49.8% in 2013. In Gwinnett County, the population dropped from 67.0% White to 41.6% over the same time period.

10.    The General Assembly responded in 2015 by enacting H.B. 566, which siphoned African-American voters out of House Districts 105 and 111 and spread them among neighboring districts with the purpose and effect of diluting African-American voting strength in House Districts 105 and 111 and preventing African-American voters in those districts from having an equal opportunity to participate in the electoral process and to elect representatives of their choice.

11.    H.B. 566 had its intended effect, as African-American candidates who ran in House Districts 105 and 111 were defeated by their White opponents in the 2016 general election.

12.    The 2015 mid-cycle redistricting was not required by any change in Census demographics or any other legitimate motive. It was prompted by two developments: (1) the fact that African-American Democratic candidates nearly won elections in House Districts 105 and 111 in 2012 and 2014, and (2) the abolition of the preclearance requirement, which the General Assembly perceived as a green light to engage in intentional vote dilution and racial gerrymandering without oversight.

13. Under H.B. 566, voters were moved in and out of House Districts 105 and 111 predominately on the basis of race. This race-based, mid-cycle redistricting was not narrowly tailored to serve a compelling government interest. As drawn in H.B. 566, House Districts 105 and 111 are racial gerrymanders that were clearly enacted with the goal of entrenching White incumbents.

14. In addition, the African-American population in certain parts of the state, most notably in the Atlanta metropolitan area, has significantly increased since both the 2000 and 2010 Censuses. As a result, Section 2 of the Voting Rights Act required the General Assembly to draw at least one additional House district in which minorities have an opportunity to elect their candidates of choice.

15. At least some African-American voters who reside in House District 111 and whose voting power was intentionally diluted as a result of the General Assembly's passage of H.B. 566 could have been drawn into a new majority-minority district in which they would have had an opportunity to elect their candidates of choice.

16. Plaintiffs seek declaratory and injunctive relief to restore and safeguard minority voting rights, which have been severely and irreparably harmed by the enactment of H.B. 566.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3) and (4) and 1357.

18.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     A three-judge district court is required pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action "challeng[es] the constitutionality of the apportionment of . . . [a] statewide legislative body."

20.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

21.     Plaintiff JAMAL BROOKS is an African-American citizen of the United States and of the State of Georgia. He is a resident and registered voter in Gwinnett County in House District 105, which is part of the Atlanta metropolitan area. As a result of the General Assembly's intentional dilution of the voting power of African Americans in House District 105, Mr. Brooks has been unable to elect his candidates of choice for the Georgia House of Representatives.

22.     Plaintiff AUSTIN THOMPSON is an African-American citizen of the United States and of the State of Georgia. He is a resident and registered voter in Gwinnett County in House District 105, which is part of the Atlanta metropolitan

area. As a result of the General Assembly's intentional dilution of the voting power of African Americans in House District 105, Mr. Thompson has been unable to elect his candidates of choice for the Georgia House of Representatives.

23. Plaintiff WAYNE SWANSON is an African-American citizen of the United States and of the State of Georgia. He is a resident and registered voter in Henry County in House District 111, which is part of the Atlanta metropolitan area. As a result of the General Assembly's intentional dilution of the voting power of African Americans in House District 111, Mr. Swanson has been unable to elect his candidates of choice for the Georgia House of Representatives.

24. Plaintiff DARRYL PAYTON is an African-American citizen of the United States and of the State of Georgia. He is a resident and registered voter in Henry County in House District 111, which is part of the Atlanta metropolitan area. As a result of the General Assembly's intentional dilution of the voting power of African Americans in House District 111, Mr. Payton has been unable to elect his candidate of choice for the Georgia House of Representatives. Moreover, because of the General Assembly's passage and implementation of H.B. 566, Mr. Payton was defeated by a White opponent in the 2016 general election for House District 111 despite the fact that Mr. Payton was the African-American voters' candidate of choice.

25. Plaintiff AUDRA CUNNINGHAM is an African-American citizen of the United States and of the State of Georgia. She is a resident and registered voter in House District 59 in Fulton County. Ms. Cunningham resides in the Atlanta metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

26. Plaintiff SABRINA MCKENZIE is an African-American citizen of the United States and of the State of Georgia. She is a resident and registered voter in House District 88 in DeKalb County. Ms. McKenzie is denied an equal opportunity to vote for candidates for the House of Representatives because she is packed in a House district where her vote is of lesser value because minority voters are concentrated there. Ms. McKenzie resides in the Atlanta metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

27. Plaintiff JAMIDA ORANGE is an African-American citizen of the United States and of the State of Georgia. She is a resident and registered voter in House District 57 in Fulton County. Ms. Orange resides in the Atlanta metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

28.    Plaintiff ANDREA SNOW is an African-American citizen of the United States and of the State of Georgia. She is a resident and registered voter in House District 92 in Rockdale County. Ms. Snow is denied an equal opportunity to vote for candidates for the House of Representatives because she is packed in a House district where her vote is of lesser value because minority voters are concentrated there. Ms. Snow resides in the Atlanta metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

29.    Plaintiff SAMMY ARREY-MBI is an African citizen of the United States and of the State of Georgia. He is a resident and registered voter in House District 75 in Clayton County. Mr. Arrey-Mbi is denied an equal opportunity to vote for candidates for the House of Representatives because he is packed in a House district where his vote is of lesser value because minority voters are concentrated there. Mr. Arrey-Mbi resides in the Atlanta metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

30.    Plaintiff LYNNE ANDERSON is an African-American citizen of the United States and of the State of Georgia.  She is a resident and registered voter in House District 90 in Rockdale County. Ms. Anderson resides in the Atlanta

10

metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

31. Plaintiff CORETTA JACKSON is an African-American citizen of the United States and of the State of Georgia. She is a resident and registered voter in House District 61 in Fulton County. Ms. Jackson is denied an equal opportunity to vote for candidates for the House of Representatives because she is packed in a House district where her vote is of lesser value because minority voters are concentrated there. Ms. Jackson resides in the Atlanta metropolitan area, where an additional majority-minority district could be drawn in order to provide a remedy for the existing Section 2 violation.

32. Defendant BRIAN KEMP is Georgia's Secretary of State and is named solely in his official capacity as such. As Secretary of State, Brian Kemp is Georgia's chief election official. In that capacity, he is responsible for promoting and supporting accurate, fair, open and secure elections for the citizens of Georgia and for implementing election laws and regulations, including the redistricting plan at issue in this litigation. *See* Ga. Code Ann. § 21-2-50(b); Ga. Comp. R. & Regs. 590-1-1-.01, .02.

11

## FACTUAL BACKGROUND

### Racial Discrimination and Voting in Georgia

33.    Georgia has a particularly egregious history of discriminating against African Americans and implementing voting practices that have hindered African Americans' ability to participate equally in the political process.

34.    This history goes as far back as the post-Civil War era, when African Americans in Georgia first gained the right to vote and voted in their first election in April 1868. After the election, the Georgia General Assembly passed a resolution that expelled 25 African-American representatives and three senators but permitted the four mixed-race members of the General Assembly who did not "look" African-American to keep their seats. The General Assembly's resolution was based on the grounds that the right of African Americans to vote did not give them the right to hold office, and African Americans were thus "ineligible" to serve under Georgia's post-Civil War state constitution.

35.    This may have been the Georgia General Assembly's first attempt to ensure that the power to vote does not translate into an equal opportunity for African-American voters to elect their candidates of choice, but it was far from its last.

12

36. In 1871, Georgia became the first state to enact a poll tax. At Georgia's 1877 constitutional convention, the General Assembly made the poll tax permanent and cumulative, requiring citizens to pay all back taxes before being permitted to vote. The poll tax reduced turnout among African-American voters in Georgia by half. It has been described as the single most effective disenfranchisement law ever passed. The poll tax was not abolished until 1945, after it had been in effect for almost 75 years.

37. Other means of disenfranchising Georgia's African-American citizens followed. Georgia adopted virtually every one of the "traditional" methods to obstruct the exercise of the franchise by African Americans, including literacy and understanding tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that African-Americans would be left waiting in line when the polls closed, the adoption of "White primaries," and the use of discriminatory redistricting processes.

38. After the poll tax was repealed in 1945, voter registration among African Americans significantly increased. However, as a result of these purposeful voter suppression tactics, between 1908 and 1962, not a single African American served in the Georgia General Assembly.

13

39.     Georgia's history of voter discrimination is far from ancient history. As recently as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end the practice, a local Macon leader declared that the federal government was ruining "every vestige of the local government."

40.     Due to its lengthy history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act upon its enactment in 1965, meaning any changes to Georgia's election practices or procedures (including the enactment of new redistricting plans) were prohibited until either the U.S. Department of Justice or a federal court determined that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 52 U.S.C. § 10304. Accordingly, between 1965 and 2013, when the Supreme Court effectively barred enforcement of the Section 5 preclearance requirement in *Shelby County v. Holder*, the federal government's independent oversight helped guard Georgia's minority voters against disenfranchisement and arbitrary and disparate treatment by the State in its election practices and procedures.

14

41.   Since 1965, Georgia has received in excess of 170 preclearance objection letters from the U.S. Department of Justice under Section 5 of the Voting Rights Act.

42.   What is briefly described here as Georgia's history of race discrimination in voting has been thoroughly documented by historians and scholars. The history is so extensive and well-established that courts have effectively taken judicial notice of it. *See*, *e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."), *aff'd and remanded*, 515 U.S. 900 (1995); *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (*quoting Brooks*, 848 F.

Supp. at 1560), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015).

43.     Georgia's redistricting plans have been invalidated numerous times by federal courts for voting rights violations. In *Georgia v. United States*, 411 U.S. 526 (1973), the Supreme Court affirmed the three-judge district court's decision that Georgia's 1972 reapportionment plan violated Section 5 of the Voting Rights Act, at least in part because it diluted the African-American vote in an Atlanta-based congressional district in order to ensure the election of a White candidate. *See also Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), *aff'd* , 459 U.S. 1166 (1983) (finding discriminatory intent in redistricting); *Miller v. Johnson*, 515 U.S. 900, 917 (1995) (finding racial gerrymandering in violation of the Fourteenth Amendment); *Abrams v. Johnson*, 521 U.S. 74, 107 (1997) (same); *Georgia v. Ashcroft*, 539 U.S. 461, 486 (2003) (finding redistricting plan made it more difficult for minority voters to elect their candidate of choice).

44.     In addition to Georgia's history of discrimination against minorities in voting and elections, political campaigns in Georgia have often relied on both explicit and implicit racial appeals.

45.     In the 2014 Democratic House of Representatives primary election in House District 105, an unidentified Republican firm reportedly conducted a

16

racially divisive robocall among likely Democratic voters in House District 105, asking if they would prefer to vote for "an Asian businessman or an African American swim mom." The poll was apparently referencing the two Democratic candidates in the primary race, Tim Hur, who is Asian-American, and Renita Hamilton, who is African-American.

46.    Recently, a member of the board of commissioners in Gwinnett County, the second most populous county in the state, called African-American Representative John Lewis a "racist pig" and suggested that his re-election to the United States House of Representatives is "illegitimate" because he represents a majority-minority district.

47.    Jere Wood, the Republican mayor of Roswell, which is Georgia's seventh largest city, recently insinuated that voters in Georgia's Sixth Congressional District – which is majority White and has been represented by White Republicans Newt Gingrich, Senator Johnny Isakson, and Tom Price over the past three decades – would not vote for Democratic candidate Jon Ossoff in the 2017 special election because he has an "ethnic-sounding" name. When describing voters in the Sixth District, Wood said, "This is a mature voter base. If someone is going down the list, they're gonna vote for somebody who is familiar. . .  If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he

17

Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

48.    On a separate occasion, state senator Fran Millar alluded to the fact that Georgia's Sixth District in Congress was gerrymandered in such a way that it would not support electing Jon Ossoff, specifically because he is the former aide to an African-American Congressman. Senator Millar said, "I'll be very blunt. These lines were not drawn to get Hank Johnson's protégé to be my representative. And you didn't hear that . . . . They were not drawn for that purpose, OK? They were not drawn for that purpose."

49.    The ability of Georgia's African-American citizens to participate in the political process has been further hindered by significant and disparate effects of discrimination in housing, education, employment, health, criminal justice, and other areas that they have suffered and continue to suffer.

50.    For example, the Georgia Department of Community Health has reported that minorities in Georgia have worse health status and more chronic health conditions than Whites. Between 2011 and 2013, the infant mortality rate for African Americans was nearly twice that of Whites.

51.    The Economic Policy Institute reported that in 2016, the unemployment rate for African Americans in Georgia was 8.5%, compared to only 3.6% among Whites.

52.    Homes in cities and neighborhoods in Georgia that have significant minority populations have lower values than homes located in predominantly White areas. Moreover, while real estate in Georgia has increased in value in those areas with small African-American populations, home values have decreased in all zip codes in the Atlanta metropolitan area where the population is at least 40% African-American.

53.    For the 2011-2012 school year, the gap between high school graduation rates for African-American and White students was 16 percentage points. To make matters worse, school discipline is doled out unevenly along racial lines, increasing the likelihood that African-American students in Georgia will become part of the "school-to-prison pipeline." According to data compiled by the Georgia Legal Services Program, during the 2011-2012 school year, African-American students made up approximately 37% of Georgia's public school population, but about 50% of the students expelled were African-American.

54.    In 2013, more than half of the prison population in Georgia was African-American despite the fact that African Americans made up only approximately 31% of the population.

## Post-2010 Census Redistricting in Georgia

55.    The Georgia House of Representatives is controlled by Republicans, who currently hold 118 out of the 180 House seats, just two seats shy of a veto-proof supermajority.

56.    African Americans in Georgia, including in House Districts 105 and 111, overwhelmingly vote for Democratic candidates over Republican candidates, and all of the African-American representatives currently serving in the Georgia House are Democrats. In the past 50 years, Georgia Republicans have only elected one African-American representative.

57.    Republicans have been intent on gaining a supermajority in the House and have used mid-cycle redistricting as a tactic to achieve their goal. Achieving a supermajority would mean that Republicans could amend the state constitution entirely without Democratic support and override gubernatorial vetoes. Because African-American voters in Georgia overwhelmingly support Democratic candidates, the interests of African-American voters would essentially go unrepresented if the Republicans are able to reach a supermajority.

58.    Article III, section II of the Georgia Constitution provides that the apportionment of the Georgia House of Representatives shall be changed "as necessary after each United States decennial census." Pursuant to this provision, following the 2010 Census, Georgia enacted Act No. 1EX, which redrew Georgia's 180 House of Representatives districts.

59.    Act No. 1EX was passed by the Georgia General Assembly on August 23, 2011, signed by Governor Deal on August 24, 2011, and precleared by the Department of Justice on December 23, 2011.

60.    Following the enactment and preclearance of Act No. 1EX, the General Assembly amended Act No. 1EX by enacting Act No. 277 (H.B. 829), which adjusted the lines of 15 House districts.

61.    Act No. 277 passed the House on a party-line vote of 101 to 53. Of the 53 votes against the bill, 51 were cast by Democrats. Of the 35 African-American Democratic representatives who voted on the bill, only two voted in favor of the legislation. Act No. 277 similarly passed the Senate on a party-line vote of 35 to 19. All of the Democratic senators who voted on the bill opposed it except for one. No African-American senators voted in favor of the bill.

62.    Act. No. 277 was passed by the Georgia General Assembly on February 23, 2012 and signed by the Governor the same day. It was precleared by the Department of Justice on May 11, 2012.

63.    The maps created by Act No. 1EX, as amended by Act No. 277, were used for the Georgia House of Representatives elections in 2012.

## Mid-Cycle Redistricting in Georgia

64.    In 2013, the Supreme Court held, in *Shelby County v. Holder*, that the preclearance requirement under Section 5 of the Voting Rights Act could no longer be enforced until the federal government enacted a new formula for determining which states should be subject to the preclearance requirement. Since then, the federal government has failed to enact such a formula. As a result, for the first time in almost 50 years, Georgia has been free to redraw legislative districts without any automatic, independent oversight by the federal government.

65.    Since the *Shelby County* decision, the General Assembly has proposed two mid-cycle redistricting plans. These plans were ostensibly proposed pursuant to Article III, section II of the Georgia Constitution, which provides that the apportionment of the House of Representatives shall be changed "as necessary after each United States decennial census," even though Georgia had already enacted a redistricting plan following the 2010 census.

22

66.  H.B. 566 was Georgia's *first* mid-cycle redistricting plan. It was proposed shortly after the state legislative elections in 2014.

67.  H.B. 566 amended the boundaries of 17 House districts, covering Atkinson, Bryan, Butts, Chatham, Clayton, Fayette, Fulton, Gwinnett, Hall, Henry, Lamar, Lanier, Lowndes, Newton, Rockdale, Spalding, Ware, and White counties.

68.  H.B. 566 contains 31 districts in the Atlanta metropolitan area in which African Americans (any part) comprise a majority of the voting age population, 30 of which are districts in which non-Hispanic African Americans (any part) comprise a majority of the voting age population and 29 of which are districts in which non-Hispanic African Americans (alone) comprise a majority of the voting age population.

69.  H.B. 566 was passed by the Georgia House of Representatives on March 11, 2015 following little debate. Amid concerns that H.B. 566 might violate voting rights laws, some Democrats tried to block H.B. 566 from passing in the Senate. H.B. 566 ultimately passed in the Senate by a 39-14 vote margin on March 31, 2015. Nine of the 13 African-American senators who cast votes on H.B. 566 voted against it.

70.    H.B. 566 was signed by the Governor in May 2015. Because preclearance by the U.S. Department of Justice was no longer required, H.B. 566 went into effect immediately.

71.    The General Assembly made a *second* attempt to engage in mid-cycle redistricting in 2017, shortly after the 2016 state legislative elections. The proposed redistricting plan continued the General Assembly's pattern and practice of shuffling voters in and out of districts based on race in order to protect White Republican incumbents and to stifle the voting power of African-American Democrats. The legislation was stalled, however, after it failed to pass the Senate.

## Changes Made to House District 105 Under H.B. 566

72.    Prior to the enactment of H.B. 566 in 2015, the demographics of House Districts 105 and 111 had changed and the minority voting age population in both had significantly increased.

73.    As a result, the White Republican incumbent representatives in House Districts 105 and 111 were vulnerable to challenge, particularly by candidates who were likely to be supported by the districts' growing African-American populations. Recognizing this, Republicans proposed and supported H.B. 566 to remove African-American voters from both House districts and replace them with White voters, shoring up the reelection prospects of the White Republican

24

incumbents, while diluting the voting strength of African Americans in House Districts 105 and 111.

74. House District 105 is located in Gwinnett County in the Atlanta metropolitan area. It has been represented by Republican Joyce Chandler, who is White, since it was first drawn in 2011.

75. Under Act No. 277, prior to the implementation of H.B. 566 in 2015, the Black, non-Hispanic voting age population ("BVAP") of House District 105 was 32.4% (11,841 voters). The White, non-Hispanic voting age population was 48.4% (17,712 voters). The Hispanic voting age population was 12.6% (4,612 voters).

76. The 2012 and 2014 elections in House District 105 were held under the district boundaries set forth in Act No. 277.

77. In the 2012 general election, Representative Chandler narrowly defeated Renita Hamilton, an African-American Democrat. Representative Chandler won 51.3% of the vote to Hamilton's 48.7% of the vote, a difference of 554 votes.

78. In the 2014 general election, Hamilton challenged Representative Chandler again. Representative Chandler won 52.8% of the vote to Hamilton's

47.2%, a difference of 789 votes. This was true even though turnout was lower in 2014 because it was not a presidential election year.

79. In 2015, under H.B. 566, the BVAP in House District 105 was decreased from 32.4% to 30.4%, a decrease of 2 percentage points. By contrast, the White voting age population was increased from 48.4% to 52.7%, an increase of 4.3 percentage points. In total, 770 African-American voters were moved out of House District 105 pursuant to H.B. 566. By contrast, 1,492 White voters were moved into the District.

80. H.B. 566 moved voters into and out of House District 105 predominantly based on race, and the General Assembly's race-based redistricting was not narrowly tailored to serve a compelling government interest.

81. H.B. 566 amended House District 105 by moving part of one precinct, Lawrenceville M, out of the district and into neighboring House District 104, a Republican district. The BVAP of the part of Lawrenceville M that was removed was 38.4%. By contrast, precinct Harbins C and part of precinct Harbins A were moved into House District 105. The BVAP of Harbins C is 10.96%. The BVAP of the part of Harbins A that was added to House District 105 is 14.0%. The precincts that were in House District 105 prior to H.B. 566 and remained in the district had an average BVAP of 31.4%.

26

82.   In the 2016 general election, which was held under the district boundaries of Act No. 277 as amended by H.B. 566, Donna McLeod, an African-American Democrat, challenged Representative Chandler and nearly defeated her.

83.   The election was so close – with a less than one percentage point margin – that McLeod requested a recount.

84.   Representative Chandler ultimately won 50.38% of the vote, and McLeod won 49.48% of the vote, a difference of 222 votes.

85.   The race-based exchange of precincts that occurred in H.B. 566 between House District 105 and its neighboring districts protected Republican incumbent Joyce Chandler and allowed for her defeat of McLeod in 2016. If the 2016 general election had taken place under the district boundaries of House District 105 prior to the implementation of H.B. 566, McLeod would have defeated Chandler and Georgia's African-American representation in the House would have increased.

86.   McLeod called the changes made by H.B. 566 "egregious." McLeod further criticized H.B. 566 as a plan that would dilute the votes of minorities, which she called "common practice" in Georgia.

87.   The voting patterns in the 2012, 2014, and 2016 general elections in House District 105 exhibited a high level of racial polarization.

## Changes Made to House District 111 Under H.B. 566

88.     House District 111 is located in Henry County in the metropolitan Atlanta area. It is currently represented by Republican Brian Strickland, who is a White Republican. Like Representative Chandler, Strickland has, in recent years, found himself fighting off general election challenges that have been incredibly close, particularly by Georgia House elections standards.

89.     Under Act No. 277, prior to the implementation of H.B. 566 in 2015, the BVAP of House District 111 was 33.2% (12,798 voters). The White, non-Hispanic voting age population was 56.1% (21,638 voters). The Hispanic voting age population was 5.6% (2,158 voters).

90.     The 2012 and 2014 elections in House District 111 were held under the district boundaries set forth in Act No. 277.

91.     In the 2012 general election, Representative Strickland defeated Bill Blackmon, an African-American Democrat. Representative Strickland won 53% of the vote to Blackmon's 47% of the vote, a margin of victory of 1,477 votes.

92.     In the 2014 general election, Jim Nichols, a White Democrat, challenged Representative Strickland. Nichols won 46.9% of the vote as compared to Representative Strickland's 53.1% of the vote, a margin of victory of 1,124 votes.

93. Under H.B. 566, the BVAP in House District 111 was decreased from 33.2% to 31.0%, a decrease of 2.2 percentage points. By contrast, the White voting age population was increased from 56.1% to 58.1%, an increase of two percentage points. In total, 946 African-American voters were moved out of House District 111 pursuant to H.B. 566. By contrast, 590 White voters were moved into the District.

94. H.B. 566 amended House District 111 by removing precincts that had an average BVAP of 40.5% and replacing them with precincts that had an average BVAP of 33.0% African-American. The precincts that were removed had an average White voting age population of 48.7% and were replaced with precincts that had an average White voting age population of 55.4%.

95. Voters were moved into and out of House District 111 predominantly based on race, and this race-based line-drawing was not narrowly tailored to serve a compelling government interest.

96. In the 2016 general election, which was held under the district boundaries of Act No. 277 as amended by H.B. 566, Darryl Payton, an African-American Democrat, challenged Representative Strickland and nearly defeated him. Representative Strickland won 51.69% of the vote as compared to Payton's 48.31% of the vote, a margin of 3.4 percentage points or 946 votes.

97.     If the 2016 general election had taken place under the district boundaries of House District 111 prior to the implementation of H.B. 566, it is likely that Payton would have defeated Representative Strickland, and Georgia would have seen its African-American representation in the House increase.

98.     The voting patterns in the 2012, 2014, and 2016 general elections in House District 111 exhibited a high level of racial polarization.

### H.B. 515 – 2017 Proposed Legislation

99.     In February 2017, the House proposed H.B. 515, its second mid-cycle redistricting bill. If it had passed, H.B. 515 would have removed predominantly African-American precincts from House Districts 40 and 111 and placed them in majority African-American districts such as House District 53, which was already represented by an African-American Democrat. The African-American voters in House Districts 40 and 111 would have been replaced with White voters, with the clear goal of making it more difficult for African-American voters to elect their candidate of choice.

100.    These proposed racial swaps were a direct response to close elections in 2016 and changing demographics in both districts, continuing the General Assembly's history of manipulating district lines in response to formidable

challenges by African-American candidates, in an effort to ensure that African-American representation does not increase further in the Georgia House.

101.   Similar to the history of House Districts 105 and 111, in House District 40, Republican Representative Rich Golick, who is White, was challenged by an African-American Democrat, Erick Allen, in 2014 and 2016. In the 2014 race, Representative Golick won by 20 points. But, by 2016, the demographics of the district had shifted, and Representative Golick's margin of victory shrunk to six points, with Allen winning 46.4% of the vote in the district when they faced off again – a full 6.6% more than when he challenged Representative Golick just two years earlier.

102.   H.B. 515 was passed by the House on March 3, 2017 on a party-line vote. All of the Democratic representatives – including all of the African-American representatives – voted against it. The Republicans who supported it did so despite the fact that Democrats and African Americans overwhelmingly opposed the legislation because it would have further diluted the voting strength of African-American voters.

103.   Specifically, if it had been enacted, H.B. 515 would have moved White voters in and African-American voters out of House Districts 40 and 111, two districts that are currently held by White Republican incumbents who were

nearly unseated by African-American Democratic challengers in the 2014 and 2016 elections. At least some of the expelled African-American voters would have been packed into House District 53, which is already a majority-minority district that consistently votes for the minority-preferred candidate.

104.   H.B. 515 was eventually tabled in the Senate.

105.   On information and belief, Republican legislators plan to reintroduce H.B. 515, or a similar version of it, during the 2018 legislative session with the hope that, if it is enacted in 2018, it will be difficult for any legal challenges to halt its implementation for the 2018 elections.

## The General Assembly's Failure to Draw at Least One Additional Majority-Minority District

106.   In addition to prohibiting practices that directly deny the exercise of the right to vote, Section 2 of the Voting Rights Act prohibits vote dilution.

107.   The United States Supreme Court, in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), identified three necessary preconditions ("the *Gingles* factors") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

108. The dilution of African-American voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Id.*, 478 U.S. at 46 n. 11.

109. Under H.B. 566, at least one additional majority-minority district should have been drawn in the Atlanta metropolitan area. For purposes of this Complaint, the Atlanta metropolitan area includes the following counties: Cherokee, Clayton, Cobb, DeKalb, Douglas, Fayette, Fulton, Gwinnett, Henry, and Rockdale.

110. H.B. 566 "packs" African-American voters in certain House Districts, including but not limited to House Districts 61, 75, 88, and 92, and "cracks" African-American population centers among other districts, preventing the emergence of at least one additional district in which minorities have an opportunity to elect their candidates of choice.

111. The insufficient apportionment of majority-minority districts to the sufficiently numerous and geographically compact African-American population in the Atlanta metropolitan area dilutes individual voters' voting power, including voters who reside in "packed" majority-minority districts.

33

112. African-American voters in the Atlanta metropolitan area are sufficiently numerous and geographically compact such that they can comprise a majority of eligible voters in at least one additional House district.

113. According to the 2010 Census, the total voting age population of the Atlanta metropolitan area, as defined in Paragraph 108 herein, is 3,029,632 people. Of this total voting age population, 47.3% are non-Hispanic White, 36.4% are African-American (any part), 35.0% are non-Hispanic African-American, and 10.2% are Hispanic.

114. By "unpacking" House districts that have been packed with African-American voters, and combining African-American population in nearby districts that has been "cracked," including voters in House District 111 whose voting power was intentionally diluted in H.B. 566, the General Assembly could have drawn at least one additional majority-minority district in the Atlanta metropolitan area, as required by Section 2 of the Voting Rights Act.

115. For example, at least part of the African-American population – specifically the African-American population in Henry County – that was intentionally "cracked" and spread among several House districts as a result of the 2015 mid-cycle redistricting, should have been drawn into a majority-minority district in the Atlanta metropolitan area.

34

116. African-American voters in the Atlanta metropolitan area are politically cohesive.

117. There is significant racially polarized voting in the Atlanta metropolitan area such that the White majority votes as a bloc usually to defeat African Americans' preferred candidates of choice.

118. For example, as detailed above, racially polarized voting in the Atlanta metropolitan area explains why African-American candidates have been defeated in recent elections in House Districts 105 and 111. Despite the fact that African-American voters supported African-American candidates in recent general elections in House Districts 105 and 111, the African-American candidates were defeated by their White opponents because the White population voted as a bloc to defeat the African-American voters' candidate of choice.

119. Moreover, the overwhelming majority of African-American representatives currently in the House of Representatives have been elected from majority-minority districts.

## CAUSES OF ACTION

## COUNT I:

### H.B. 566 was enacted with a discriminatory purpose in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution

120.   Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

121.   Section 2 of the Voting Rights Act of 1965 prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

122.   Section 1 of the Fourteenth Amendment to the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

123. The Fifteenth Amendment to the United States Constitution prohibits the denial or abridgement of the right to vote on account of race, color, or previous condition of servitude.

124. Legislation intended, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth and Fifteenth Amendments. *See*, *e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

125. The Republican-controlled General Assembly enacted H.B. 566 with the intent to discriminate against African-American voters and other minority voters in House Districts 105 and 111 by diluting their voting strength. The General Assembly's purposeful actions had the effect of denying African-American voters the opportunity to elect their candidates of choice, in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution.

126. There are several indicators of discriminatory intent in this case, including at least evidence of substantial discriminatory impact and a history of discriminatory official actions.

127. By engaging in the acts and omissions alleged herein, Defendant has acted and continues to act to deny Plaintiffs rights guaranteed to them by Section 2

of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Defendant will continue to violate those rights absent relief granted by this Court.

128.   The State's violations reflect intentional racial discrimination and violations of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments in derogation of the current conditions for minority voters in the state. Therefore, they justify the imposition of equitable relief authorized by Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), which would require Georgia to "pre-clear" changes to voting laws and procedures with the U.S. Department of Justice or a federal court.

129.   In the absence of relief under Section 3(c) of the Voting Rights Act, there is a danger that Georgia will continue to violate the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments in the future.

## COUNT II:

**H.B. 566 violates the results prong of Section 2 of the Voting Rights Act.**

130.   Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

131.   Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

132.   The current district boundaries for the House of Representatives dilute the electoral strength of the African-American residents in the Atlanta metropolitan area, in violation of Section 2 of the Voting Rights Act.

133.   Under Section 2 of the Voting Rights Act, the Georgia General Assembly was required to create at least one additional district in the Atlanta metropolitan area in which African Americans have the opportunity to elect their candidates of choice.

134.   African-American voters are sufficiently numerous and geographically compact in the Atlanta metropolitan area.

135.   African-American voters in the Atlanta metropolitan area are politically cohesive, and elections in this area reveal a clear pattern of racially polarized voting that allows the bloc of White voters to usually defeat the African Americans' preferred candidates.

136. The totality of the circumstances establishes that the current House of Representatives district map has the effect of denying African-American voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

137. By engaging in the acts and omissions alleged herein, Defendant has acted and continues to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act. Defendant will continue to violate those rights absent relief granted by this Court.

## COUNT III:

**House Districts 105 and 111 are racial gerrymanders in violation
of the Fourteenth Amendment to the United States Constitution**

138. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

139. Section 1 of the Fourteenth Amendment to the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due

process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

140. Race was the predominant factor in the creation of House Districts 105 and 111 under H.B. 566.

141. The use of race as the predominant factor with respect to House Districts 105 and 111 was not narrowly tailored to serve a compelling state interest.

142. Accordingly, House Districts 105 and 111 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

143. By engaging in the acts and omissions alleged herein, Defendant has acted and continues to act to deny Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the United States Constitution. Defendant will continue to violate those rights absent relief granted by this Court.

144. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to permanently enjoin the conduct of elections in House Districts 105 and 111 will irreparably harm Plaintiffs by violating their constitutional rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

41

A. Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

B. Declare that H.B. 566 violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution;

C. Declare that House Districts 105 and 111 are racial gerrymanders because they were drawn with race as the predominant purpose and were not narrowly tailored to achieve a compelling state interest.

D. Order the adoption of a valid House of Representatives redistricting plan that includes at least one additional majority-minority district in the Atlanta metropolitan area.

E. Issue a permanent injunction enjoining Defendant, his agents, and successors in office, from enforcing or giving any effect to the boundaries of the House Districts in the Atlanta metropolitan area as drawn in H.B. 566, including an injunction barring Defendant from conducting any further elections in those districts for the Georgia General Assembly;

F. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order a valid plan for new House of Representatives districts

42

43

in Georgia that comports with the U.S. Constitution and Section 2 of the Voting Rights Act;

G.    Issue an injunction requiring the State, for not less than the next ten years, to obtain preclearance from either this Court or the Attorney General of the United States prior to implementing any state-level redistricting or electoral changes; and

H.    Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated:  October 3, 2017                Respectfully submitted,

By /s/ *Quinton Washington*
Quinton Washington (GA Bar No. 159067)
Bell & Washington LLP
196 Peachtree Street SW, Suite 310
Atlanta, GA 30303
Phone: (404) 437-6641
Email: Quinton@bellwashington.com

Marc Erik Elias (*pro hac vice-to be filed*)
Aria C. Branch (*pro hac vice-to be filed*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: ABranch@perkinscoie.com

Abha Khanna (*pro hac vice-to be filed*)
Perkins Coie, LLP
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*